Filed 6/24/16  P. v. Bellows CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B264633 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA130645) |
| v. | |
| PATRICIA BELLOWS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Pat Connolly, Judge.  Affirmed.

Allison H. Ting, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Patricia Bellows (defendant) appeals from her attempted murder convictions. She contends that her convictions as an aider and abettor must be reversed because substantial evidence did not support a finding that she harbored an intent to kill. Defendant also contends that her two life sentences must be reduced because the trial court failed to instruct the jury that it must find that she personally premeditated and deliberated the attempted murders. Finding no merit to defendant's contentions, we affirm the judgment.

## BACKGROUND

Defendant and codefendant Patrick Chattman (Chattman) were jointly charged with two counts of attempted murder and one count of shooting at an inhabited dwelling. The information alleged in count 1 that defendant and Chattman attempted to murder Lynn Jones (Jones), and in count 2, that defendant and Chattman attempted to murder Pond Mosby (Mosby), in violation of Penal Code sections 664 and 187, subdivision (a).[1] In count 3, defendant and Chattman were charged with shooting at an inhabited dwelling in violation of section 246. The information also alleged that a principal personally and intentionally discharged a firearm in the commission of the offenses, within the meaning of section 12022.53, subdivisions (b), (c), and (e)(1), and that for purposes of the penalty enhancement of section 664, subdivision (a), that the attempted murder was willful, deliberate, and premeditated, and that a principal personally used a firearm. The information further alleged that the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang, within the meaning of section 186.22, subdivision (b); that defendant had suffered three prior serious or violent felony convictions, within the meaning of the "Three Strikes" law (§§ 667, subds. (b)-(j), 1170.12, subds. (a)-(d)); that she had suffered one prior serious felony conviction, within the meaning of section 667, subdivision (a); and that she had served one prior prison term within the meaning of section 667.5, subdivision (b).

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

A jury found defendant, who was tried separately from Chattman, guilty of all three counts as charged, and found true all the special allegations. Defendant admitted her prior convictions, and on June 4, 2014, the trial court sentenced her to a total prison term of 85 years to life. Count 1 was comprised of a term of 15 years to life, doubled as a second strike to 30 years to life, plus 20 years due to the discharge of a firearm by a principal, and five years due to the prior serious felony conviction. The court stayed the gang enhancement, as well as the second firearm enhancement alleged as to count 1. The court imposed 15 years to life in prison as to count 2, also doubled as a second strike, and imposed but stayed a 20-year enhancement due to the discharge of a firearm by a principal. The court also stayed the gang enhancements and the second firearm enhancement. As to count 3, the court struck the prior strike conviction, and sentenced defendant to the middle term of five years in prison, plus 20 years due to the firearm allegation, and then stayed the entire term pursuant to section 654. The court imposed mandatory fines and fees, as well as victim restitution, and awarded presentence custody credit.

Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

### *The party*

Defendant's brother, Norvalle Willis (Willis) testified that on July 20, 2013, he attended a party at the 119th Street home of "Boli," a childhood acquaintance. Willis's girlfriend Yocacia Lewis (Lewis) had invited him, as he and Boli were no longer "hanging out" at the time of the party. After Willis and Boli got into an argument, Boli "jumped" Willis, and then nearly all the guests, about 30 people, joined Boli in beating Willis. When defendant and two friends came to Willis's assistance, defendant was pulled out to the street where she was beaten as well. Willis and defendant then left the area in their mother's red Lincoln Navigator truck, driven by defendant's significant other, Anjane, who had parked it nearby. Willis suffered a "busted" lip and a sore ankle, and defendant was bleeding from the head when they returned home. Defendant refused to go to the hospital, and the next morning, she said she was fine.

3

Willis testified that Boli claimed membership in Piru, a Blood gang in Hawthorne. Willis had a "P" tattoo between his eyebrows which was visible during his testimony.

***The shooting***

A few days after July 25, 2013, Jones was asleep in her home, the site of her son Boli's recent party. Also present were her boyfriend Mosby, her daughter Kristalyn Ward (Ward), another daughter, and her two-year-old grandson. Jones, Mosby, and Ward testified regarding the events at their home that morning. Jones was awakened about 2:30 a.m. by a knock at the door. From her bedroom window she saw a young, thin, African-American man wearing a black hoodie. Half asleep, she thought the person said he was her deceased brother, and imagined that she saw him, although she later realized that he was asking for her son Boli. Mosby woke up as Jones was heading toward the bedroom door to go downstairs. He heard someone calling for Jones's son, went to the window, and when he saw the thin African-American man wearing a hoodie, Mosby asked, "Who is it?" As soon as the man heard Mosby's voice, he pointed a gun up toward the window. Jones had turned back and was approaching the window, when Mosby saw the man fire the gun three times. Mosby told Jones, "Get down, he got a gun," pushed her to the floor, and heard more gunfire. Jones testified to hearing seven gunshots in all. Mosby testified that he heard six to eight gunshots, one right after the other.

When the gunfire stopped Jones looked out the window, saw a red or burgundy truck driving away, and heard a male voice say, "Fuck crips." Jones called 911 as her children ran into the room. Later, Jones identified a photograph of her house and pointed out the bullet holes, which had not been there prior to the shooting. One of the bullets pierced the door and hit an interior wall of the living room.

Ward had been sleeping in her own room when she was awakened by the gunfire. She then heard someone running off saying, "Fuck Crabs." Ward testified that "crabs" was a derogatory term for the Crips, a criminal street gang. The home was in a Crip neighborhood, but Ward denied that any Crip gang member lived in the house, and testified that her brother Boli was not a gang member.

4

*Pursuit, arrest, and investigation*

Mario Gonzalez, a police officer with the Los Angeles Unified School District (LAUSD), testified that about 2:00 a.m. on July 25, 2013, he heard gunfire while he was at the 118th Street Elementary School, investigating a school burglary with other officers. Since it seemed to Officer Gonzalez that the shots were within a two-block radius of his location, he got into his police car and drove toward the sounds. He soon saw a speeding red Lincoln Navigator turn onto Main Street from 119th Street after failing to stop at a stop sign. Suspecting that the Navigator was related to the gunshots, Officer Gonzalez radioed for assistance, broadcast his location and direction, and followed the Navigator. The interior of the Navigator was illuminated when it made a left turn which enabled Officer Gonzalez to see Chattman looking back from the rear driver's side passenger seat.[2] Officer Gonzalez saw Chattman say something to the driver, and the Navigator increased its speed.

Moments later the Navigator abruptly stopped midblock, all four doors opened, then all doors suddenly closed again, and the Navigator sped off at approximately 40 to 45 miles per hour in a 25 miles per hour residential zone. Other officers had joined the pursuit, and the Navigator appeared to be trying to evade them, so the officers activated their lights, sirens and floodlights. The Navigator then slowed down, and Officer Gonzalez observed Chattman extend his arm out and toss a gun up over the roof of the car onto the sidewalk. Officer Gonzalez radioed for someone to pick up the gun and followed the Navigator as it turned right onto San Pedro Street, where it again abruptly stopped midblock. The Navigator proceeded on, picked up speed, and finally veered over to the right, where it came to a stop at the sidewalk. The doors opened and Chattman exited first, while the Navigator was still moving, with the result that a rear tire ran over Chattman's foot and trapped him. Officer Gonzalez was about 15 feet away when the others alighted, and he ordered them to stop and surrender. Defendant who was illuminated by the floodlights of several patrol cars, hesitated and stared at the officer,

---

**2**      Chattman was brought into court in custody, and Officer Gonzalez identified him in court.

5

then looked at Chattman and back into her car, and then back at Officer Gonzalez before running southbound where the other three occupants had run.

Officer Gonzalez broadcast defendant's description, and within five minutes, other officers, two blocks away, called to say they had detained someone matching that description. Officer Gonzalez took Chattman into custody, and then drove to defendant's location where he identified her as the driver of the Navigator. A third suspect, Ricky Levi (Levi), was also detained. Officer Gonzalez identified Levi as another occupant of the Navigator. After Officer Gonzalez learned that there had been a shooting into an inhabited dwelling on 119th Street, very close to where he first saw the Navigator go through the stop sign, he went to the house, where he immediately saw eight spent bullet casings on the street. He recovered the casings and submitted them for testing.

LAUSD Officer Joseph Wilson, who was also investigating the burglary at the 118th Street Elementary School, heard nine or ten gunshots in the area surrounding the school. He joined the pursuit of the Lincoln Navigator and was right behind Officer Gonzalez when he heard the radio call regarding the tossed gun. Officer Wilson found and recovered the gun and its magazine and continued the pursuit.

LAUSD police officer Alejandro Munguia, also heard gunshots and joined the pursuit of the Navigator. Officer Munguia saw the Navigator stop and the occupants flee, and was also able to see defendant looking back toward the officers after she emerged from the driver's seat. Officer Munguia and his partner pursued defendant and the other suspects who ran, but lost sight of them. A short time later, as he was helping set up a perimeter, he saw defendant walking toward him. He recognized her immediately and arrested her. At the police station, defendant told Officer Munguia to get her "the fuck" out of the car; she then leaned her body back and kicked the window with her feet four times as she said such things as "What? It's only a fucking misdemeanor. What are you going to do about it? It's only a misdemeanor." Defendant did not appear to Officer Munguia to be intoxicated and she did not say she was drunk.[3]

---

[3]    The parties stipulated that a first-offense DUI is a misdemeanor.

Firearms expert Allison Manfreda testified that she test-fired the gun recovered in this case, examined the discharged cartridge cases, and determined that the spent casings recovered from the residence on 119th Street were fired from the same gun. She also examined the bullet fragments in evidence, and determined that the fragments had been fired from the same gun.

### Gang evidence

Los Angeles Deputy Sheriff and gang detective Raul Magadan, who had particular expertise with regard to the Fruit Town Piru gang, testified as the prosecution's gang expert.[4] He described the extent of the gang's territory, explained that the Fruit Town Piru gang was a Blood gang whose rivals included Crip gangs. He testified that the house on West 119th Street was located in territory claimed by a Crip gang. Tattoos favored by Fruit Town Piru gang members often included a derogatory term for a rival, such as "TMS" which stood for Tuna Murder Squad, or "FHMS" for Fish Head Murder Squad. Fruit Town Piru members also used the San Francisco 49ers' logo "SF" to stand for Strictly Fruits, as well as the Philadelphia Phillies or the Pittsburgh Pirates logo "P" for Piru. With approximately 250 documented members, the Fruit Town Piru gang's primary activities included possession of firearms, possession of narcotics for sale, burglaries, robberies, attempted murder, and murder. Detective Magadan presented certified copies of conviction records for two Fruit Town Piru gang members: one for robbery and witness intimidation in 2012; and one for murder and attempted murder in 2013.

Detective Magadan was acquainted with defendant who had admitted to him that she was affiliated with the Fruit Town Piru criminal street gang. He also knew several of defendant's relatives who were members of the gang, and had been in contact many times with defendant and her family members since 2006. He explained that the term "Fam Bam" meant family members or others who had your back, whether in the gang or not,

---

[4] Detective Magadan testified that there were numerous Piru gangs, but to his knowledge, there were none in Hawthorne.

and that it was the name of a clique or subset of the Fruit Town Piru gang.  Detective Magadan knew defendant to associate with members of the gang and to frequent gang areas.  The dead end of Peach Street was a well known place for gang members to congregate, and Detective Magadan had encountered defendant there with other gang members.  He had also come into contact with defendant a number of times on the 400 block of Peach Street, as well as in Gonzalez Park and near Peach Street and Paulsen Avenue, not far from another Fruit Town Piru gang member's home.  Defendant's grandmother's home on Peach Street was also a well known place for Fruit Town Piru gang members to congregate.

Detective Magadan identified a number of photographs of defendant's gang related tattoos and explained their significance.  He testified that a person who had not earned the right to do so would not wear a gang related tattoo or other gang symbol, for fear of retaliation by the gang.  Only members of the gang, and only those who had earned status and respect within the gang, had the right get a gang tattoo without retaliation.  Status and the respect of fellow gang members was earned by "putting in work" for the gang, which consisted of committing crimes, such as robberies, burglaries, assault with a deadly weapon, attempted murders, and murders.  Defendant's tattoos included a "Famous Star," an "F" for Fruit Town, "Death before Dishonor," "FAM" on the right arm, "BAM" on the left arm,  "SF" written like the San Francisco 49ers logo, and "400 percent."  Detective Magadan explained that when the letter T appeared in one of defendant's tattoos, the T was crossed out to denote disrespect for the rival Treetop Piru gang.  The "400 percent" tattoo stood for the 400 block of Peach Street and Oleander Avenue as well as the percentage of loyalty to defendant's clique.

Detective Magadan testified that if a Fruit Town Piru gang member suffered a beating at a party, some kind of retaliation would "absolutely" be expected.  By committing violent crimes, gang members gain increased status within the gang and help maintain the gang's reputation for violence and control over its territory.  A gang member's failure to retaliate would be seen by both fellow gang members and other gangs as weakness which could embolden other gangs to commit crimes against the

victim's gang. Retaliation was usually more violent than the initial act. As Detective Magadan expressed it, "For example, if you're assaulted or beat up by a different person, they're going to come back with a gun, or with a knife, or they're going to assault you with 10 different guys. . . . They're, basically, sending a message, hey, we're not to be messed with."

Detective Magadan testified that the majority of crimes committed by gang members were committed with fellow gang members. Often there would be a getaway driver, a lookout, and one or more shooters. Not only would there be strength in numbers this way, but also witnesses to the participants' willingness to commit violent crimes for the gang, thus allowing them to earn increased status in the gang. Increased status, in turn, would allow them to give orders to newer gang members or those who are less willing to commit violent crimes.

Levi, the third suspect arrested after the shooting, had been interviewed by Detective Magadan at a time when Levi was a suspect in a narcotics investigation. Levi admitted that he was a Fruit Town Piru gang member and that his moniker was "Wacko." Detective Magadan knew of Chattman, having heard of him as a suspect in an assault with a deadly weapon investigation. The detective had also reviewed numerous field interview cards prepared by other deputies, reflecting that Chattman had admitted his affiliation with the Fruit Town Piru gang to them.

In answer to a hypothetical question mirroring the facts in evidence at trial, Detective Magadan gave his opinion that the crimes were committed for the benefit of the gang, and in association with other members of the gang. He explained that the crimes would benefit the gang by helping keep a foothold in the area, control the gang's territory and maintain the gang's reputation, which in turn would create an atmosphere of intimidation and make people afraid to come forward. Asked to assume one of the gang members shouted out either "Fuck crips" or "Fuck crabs" after the shooting, Detective Magadan testified that either term expressed disrespect for Crip gangs and demonstrated their rivalry, which bolstered the detective's opinion that the crimes were committed for the benefit of the gang.

Detective Magadan testified that while executing a search warrant for defendant's brother Willis, he found Willis's Facebook page and copied several posts. The top three lines of the Facebook page read: "**About Me** Notorious Lil ckaay SMOOVE"; "Fruit Town Bompton Piru 400 peach"; and "Fam Bam 387 FROOTAz." Detective Magadan explained that Willis's moniker was "CK Smooth," and that CK stood for Crip killer. The Detective also explained that "Frootz" meant Fruits, and that "400 Peach" and "Fam Bam" referred to the Fam Bam clique of the Fruit Town Piru gang. A post by "CckSmoove Willis" dated July 22, 2013, read: "For all Yoouu weird niggahz that saay yall Looking o4 mee im on Paulsen and Peach in bompton soo cckome gettk mee Bitch ass niggahz. Stop asking ppl where i Live i just told youu." Detective Magadan explained Paulsen Avenue and Peach Street were within boundaries of Fruit Town Piru gang's territory, that "ck" was added to K sounds to denote Crip killer, and "tk" to T sounds to denote Treetop killer. Treetop was another rival of the Fruit Town Piru gang.

A Facebook post dated July 21, 2013, read: "we gottk paccked outtk at a little party over there me and my sister buttk piruu we was on them cckraabz bloood buttk piiiiru im going o2 talcck o2 youu." Detective Magadan translated "packed" to mean jumped or assaulted; and "we was on them cckraabz" meant that they defended themselves against the Crips. He explained that Willis was letting his gang know that they had been assaulted at a party and they had defended their honor.

Because the information was made known to the gang, it was the detective's opinion that the Fruit Town Piru gang was required to defend the gang's honor by retaliating, and to do so with a greater level of violence in order to maintain the gang's dignity.

**Defense evidence**

Lewis testified that she attended the party at the 119th Street house the night that her former boyfriend, Willis, got into a fight. The party was given by Boli's sister, Keyana Williams, who invited Willis. Willis was jumped about an hour after he arrived and soon almost everyone there was fighting. Willis left in a car driven by his sister, whom Lewis identified as defendant. Lewis did not know whether Boli was involved in

10

the fight, whether any Crip gang member lived in the house on 119th Street, or whether any guest at the party belonged to a gang. She testified that Willis was not a gang member and did not engage in what she would describe as gang activity. Lewis claimed that she did not see defendant involved in any fight that night, and she knew nothing about any shooting.

Ronald Taylor (Taylor) also attended the party. He testified that he knew Boli and his brother Keon, who also attended. Taylor had known defendant since he was 12 or 13 years old, and also knew her brother Willis. Defendant and Willis attended the party and were involved in a fight during which Willis was beaten and defendant was hurt. Taylor helped them get away from the fight and to defendant's car, a burgundy SUV that belonged to defendant's mother.

On the night of July 25, 2013, Taylor spoke with defendant at a club in Bellflower. Defendant left the club at the same time he did, around 1:30 or 2:00 a.m., in the company of five men who were unknown to Taylor. Defendant appeared to be highly intoxicated, and they discussed whether she should drive. Defendant assured Taylor she could drive, and then drove away with her companions in the red SUV. Taylor worried about defendant until she called to say she had arrived at a friend's house.

Taylor claimed to be unfamiliar with the Fruit Town gang, did not associate with members of Fruit Town, and did not know that defendant was an admitted member of that gang. Taylor was unaware that Willis had publicized his membership in Fruit Town, and it would surprise him to see a Facebook page on which he claimed membership in Fruit Town or 400. Taylor was somewhat familiar with gang tattoos and knew that defendant had tattoos, but he claimed not to have seen them and was unaware of what they were, except for "400 percent Tiffany" on defendant's neck. Taylor explained that Tiffany was defendant's former girlfriend, and he thought the tattoo related to her. The prosecutor showed Taylor photographs of defendant's remaining tattoos, but Taylor did not think any of them were gang related. Taylor was familiar with the term Fam Bam only as the rap music label, Fam Bam Entertainment. He knew the term 400 only as an

11

abbreviation for the music label. He claimed he had never known defendant to participate in gang activity.

Taylor originally met Willis in Hawthorne, and never knew him to participate in gang activities. Taylor was Willis's friend on Facebook, but he did not recall that Willis used the name CK Smoove. Taylor claimed he was unfamiliar with Willis's posts about 400 or Fruit Town, and that he did not see the post about the beating at the party or any of Willis's other posts. Taylor had heard the word "Bompton" in songs, but was not sure whether Piru used it for Compton. Taylor had never known Willis to throw gang signs and when he was shown a photograph of Willis forming a four, with "400 Peach" written on the photograph, he denied that it was gang related. Taylor explained that 400 referred to a music label, and that YG-400 was the name of a famous rapper. Willis wanted to be a rapper, wrote rap music, and was trying to become known. Taylor claimed that he was not in the area of 119th and Main Streets on July 25, 2013, around 2:30 a.m., and he knew nothing about what happened in the shooting that night.

Wayneisha Crawford (Crawford) testified that defendant dated her sister in the past. On July 25, 2013, around 1:00 or 2:00 a.m., defendant came to the home where she lives with her mother and sister, and asked to use the bathroom. Defendant arrived in her mother's red SUV with some other people who did not come into the house. Defendant was drunk, loud, and stumbling, and stayed for about 30 minutes. Crawford asked defendant to lower her voice because the children were asleep. When she did not, "Auntie" asked her to leave. Crawford saw defendant get into the driver's seat of the red SUV, and drive away with her companions.

Crawford was not sure of the date of defendant's visit, but it was the day that defendant went to jail. Crawford could not remember whether defendant was released after her arrest and had not seen or talked to defendant since that night. Crawford did not come forward with her information about that night until defendant's mother called during the week of trial to ask whether defendant had come over that night. When Crawford confirmed she had, defendant's mother asked her to come to court to testify.

Defendant did not testify.

12

## DISCUSSION

### I. Substantial evidence

Defendant contends that substantial evidence did not support her conviction as an aider and abettor of the attempted murders. In particular, she contends that the evidence was insufficient to prove that she shared the shooter's intent to kill.

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 396.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and [with] (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citations.] . . . [T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing -- which means that the person guilty of

13

attempted murder as an aider and abettor must intend to kill. [Citation.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623-624 (*Lee*).)

Defendant points out that the trial court declined the prosecutor's request to instruct on the natural and probable consequences theory of aiding and abetting, and instructed instead solely on principles of direct aiding and abetting. We glean from this that defendant's contention is essentially that although the evidence would have been sufficient under a natural and probable consequences theory of aiding and abetting, it is not sufficient under a theory of direct aiding and abetting. Under the natural and probable consequences doctrine, "[a]n aider and abettor is guilty not only of the intended, or target, crime but also of any other crime a principal in the target crime actually commits (the nontarget crime) that is a natural and probable consequence of the target crime. [Citations.] 'Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault.' [Citations.]" (*People v. Smith* (2014) 60 Cal.4th 603, 611; see *People v. Favor* (2012) 54 Cal.4th 868, 872 (*Favor*) [doctrine applies to attempted murder].)

Defendant concedes that "there was sufficient evidence that [defendant] must have known there was a gun in the car, and that her purpose in driving herself and four gang members to the Jones/Mosby house was to extract revenge." She further concedes that defendant "must have known there would be a shooting at the target house, as the shooting took place around 2:30 a.m., when occupants normally would be inside, sleeping"; and then concludes: "In short, [defendant] aided and abetted a shooting at an inhabited dwelling." Defendant also notes that "knowledge of the shooter's intent to shoot at the house can readily be inferred from the fact [defendant] drove the armed fellow gang member to the house to conduct an unspecified act of retaliation with a gun." Defendant contends, however, that "there was no evidence that [she] knew, and intended, that the shooter would actually summon the people to the window, by calling out, and then aim at people in the window and attempt to kill them," and "no evidence that

14

[defendant] knew the shooter would do something more egregious than merely shoot at the house, i.e., that he would attempt to kill."

Defendant asserts that the evidence showed only that shooting at the inhabited dwelling was the intended (target) offense; thus, she was properly convicted of *that* crime as a direct aider and abettor.  On the other hand, she asserts that attempted murder was the nontarget offense, and thus concludes that she could have been properly convicted of attempted murder only under the natural and probable consequences doctrine.  Defendant argues that "under the direct liability theory . . . it is irrelevant whether she should have foreseen that the perpetrator would harbor that intent," and as the natural and probable consequences doctrine was not at issue here, defendant contends that her conviction of attempted murder must be reversed.

Our difficulty with defendant's reasoning is that it is apparently premised on an assumption that all the conceded facts are relevant *only* to a natural and probable consequences theory, and cannot provide any evidence that she knew of and shared the shooter's intent to kill.  In reality however, many of the facts that support liability under the natural and probable consequences theory may also support direct aider and abettor liability.  (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295.)  "[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may . . . be inferred from the defendant's acts and the circumstances of the crime.  [Citation.]"  (*People v. Smith* (2005) 37 Cal.4th 733, 741.)  "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.  [Citations.]"  (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.)  Thus, evidence supporting an inference that defendant "should have foreseen" the shooter's intent to kill, when considered in light of all the circumstances, can support a finding that she did in fact foresee the shooter's intent and that she shared it.

Initially we observe that the conceded facts and other circumstances provide substantial evidence to raise a reasonable inference that the shooter intended to kill, and defendant does not contend otherwise.  Where a motive is shown, pointing a gun at the

victims and firing "'"'in a manner that could have inflicted a mortal wound had the bullet been on target"'" is sufficient to support an inference of intent to kill. [Citation.]" (*People v. Smith, supra*, 37 Cal.4th at p. 742.) Thus, the shooter's intent to kill may be manifested by multiple wall-piercing gunfire aimed at persons inside an inhabited dwelling. (*People v. Vang* (2001) 87 Cal.App.4th 554, 564.) Further, an intent to kill may reasonably be inferred from evidence that the motive of the assault was gang-related, particularly in conjunction with evidence of planning activity. (*People v. Ramos* (2004) 121 Cal.App.4th 1194, 1208; see *People v. Gonzales and Soliz, supra*, 52 Cal.4th at p. 294 [factors suggesting premeditation].) And an intent to kill may reasonably be inferred when a gang member fires multiple shots at people in rival gang territory. (See *People v. Francisco* (1994) 22 Cal.App.4th 1180, 1192.) Willis's Facebook page called for the gang to retaliate for the beatings at the party, at least three gang members participated in the crime, and a slur against Crips was shouted immediately after the shooting. Armed with a gang motive and a firearm, the shooter went to the house, pointed his gun toward the window from where two victims had just looked out and spoken to him, fired three times while Mosby was still at the window, and fired four more times, with one of the bullets piercing a door and lodging in an interior wall. Thus, motive, planning, and the manner of the crime's commission support a finding that the shooter intended to kill.

Relevant factors in determining whether defendant intended to assist the perpetrator in committing his intended crime include "'"presence at the scene . . . , companionship, and conduct before and after the crime, including flight."'" (*People v. Medina* (2009) 46 Cal.4th 913, 924.) "Although 'gang evidence standing alone cannot prove a defendant is an aider and abettor to a crime' [citation], . . . expert testimony [may] strengthen[] inferences arising from other evidence specific to defendant's role in the crime at issue." (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) Defendant accompanied fellow gang members, including one armed with a firearm, into rival territory to the house of those targeted by her gang for revenge -- all circumstances that can support an inference defendant was aware of the impending shooting when she acted. (Cf. *People v. Nguyen*.) Such circumstances indicate that defendant shared the shooter's

intent to kill people at the house on 119th Street, particularly when they are considered with the following facts: defendant's active membership in the gang and frequent association with fellow gang members; the gang's expectation that its members violently retaliate against perceived wrongs, and that they put in work for the gang by committing such crimes as firearm possession and attempted murder; the call to all Fruit Town Piru gang members on Willis's Facebook page urging revenge for the beating at the party; defendant's own motive for revenge for her beating; the gang's expectation that as a member, defendant would avoid the appearance of weakness by participating in violent retaliation; her participation in the crime by driving her accomplices to the house and acting as getaway driver after the shooter returned to the car with the gun; her facilitating the post-shooting gun toss, by slowing the car while Chattman threw it over the roof to the sidewalk; and then driving the car in a manner to evade the police.

We conclude that substantial evidence supported the jury's finding that defendant knew and shared the shooter's intent to kill at the time she directly aided and facilitated the crime by driving those gang members to the house on 119th Street.

## II. Willful, deliberate, and premeditated attempted murders

Defendant contends that the true findings that the attempted murders were willful, deliberate, and premeditated must be reversed, because the jury was not instructed to find that she *personally* premeditated and deliberated; and that the error violated her right to a jury trial guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

The true findings were made pursuant to section 664, subdivision (a) (hereafter section 664(a)), which prescribes the punishment for certain attempted crimes, and provides in relevant part that "if the crime attempted is willful, deliberate, and premeditated murder, . . . the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole." This provision "properly must be interpreted to require only that the murder attempted was willful, deliberate, and premeditated, but not to require that an attempted murderer personally have acted with willfulness, deliberation, and premeditation, even if he or she is guilty as

17

an aider and abettor." (*Lee, supra*, 31 Cal.4th at pp. 627-628; see also *Favor, supra*, 54 Cal.4th at p. 877; *People v. Bright* (1996) 12 Cal.4th 652, 655-657 (*Bright*), overruled on other grounds as stated in *People v. Seel* (2004) 34 Cal.4th 535, 543-544 [same].)

Defendant argues that *Favor*, *Lee*, and *Bright* have been implicitly invalidated in part by *Alleyne v. United States* (2013) __ U.S. __ [133 S.Ct. 2151] (*Alleyne*), because the United States Supreme Court overturned a federal sentencing practice which she contends was comparable to section 664(a). In *Alleyne*, the Supreme Court clarified and expanded the rule of *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 (*Apprendi*), by holding: "Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt. [Citation.] Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." (*Alleyne*, *supra*, at pp. 2155-2156; see also p. 2162.)

In its material respects, the federal sentencing practice in *Alleyne* was *not* comparable to section 664(a), as defendant asserts. *Alleyne* involved a sentence enhancing statute which increased the penalty for the crime of carrying or using a firearm in the commission of a crime of violence, if the firearm was brandished during that crime. (*Alleyne*, *supra*, 133 S.Ct. at p. 2155.) The federal statute did not require the jury to find brandishing beyond a reasonable doubt, and in that case, the fact was found by the court, not the jury, by just a preponderance of the evidence. (*Id*. at p. 2156.) Though section 664(a) is also a penalty provision (*People v. Chiu* (2014) 59 Cal.4th 155, 162), it differs from the sentence enhancement in *Alleyne*, in that it provides as follows: "The additional term provided in this section for attempted willful, deliberate, and premeditated murder shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact." (§ 664(a).)

Although section 664(a) is a penalty provision and not a separate crime or degree of attempted murder, premeditation and deliberation is "an allegation of a circumstance that justifies an increased sentence." (*Bright, supra*, 12 Cal.4th at p. 656, fn. 2.) Thus,

18

whatever its label, for purposes applying the *Apprendi* rule, the allegation "is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict." (*Apprendi*, *supra*, 530 U.S. at p. 494, fn. 19; see *Favor, supra*, 54 Cal.4th at p. 877, fn. 2, citing *People v. Seel, supra*, 34 Cal.4th at p. 550, fn. 6 [for purposes of double jeopardy].) Here, the allegation was properly treated as the functional equivalent of section 664(a), as the circumstance that the attempted murder was committed willfully and with deliberation and premeditation was alleged in the information, presented to the jury, and specifically found true by the jury beyond a reasonable doubt. The Sixth Amendment was thus satisfied. (See *Alleyne, supra*, 133 S.Ct. at pp. 2155, 2157-2158.)

Defendant's reliance on *Alleyne* is unclear, as she does not contend that the element of premeditation and deliberation was not presented to the jury or that the jury did not find it true beyond a reasonable doubt, instead she argues: "Here, [defendant] was found guilty of and punished for attempted premeditated/deliberated murder, even though the question whether *she* premeditated and deliberated was not presented to the jury, and even though the jurors were not required to find that it was reasonably foreseeable *to her* that the shooter would commit an attempted premeditated murder. Under *Alleyne*, premeditation -- even if it is called a 'penalty provision' -- nonetheless is an element, such that it must be proven that [defendant] committed it, aided and abetted it, or is otherwise responsible for it; or else she may not be punished for it."

Defendant's conclusion fails to logically follow from her reasoning, as she was not found guilty of "attempted premeditated/deliberated murder"; she was found guilty of attempted murder, and the jury then made additional findings of premeditation and deliberation, as "the jury does not decide the truth of the penalty premeditation allegation until it first has reached a verdict on the substantive offense of attempted murder. [Citation.]" (*Favor*, *supra*, 54 Cal.4th at p. 879.) Although the premeditation and deliberation allegation may be deemed an element of a separate crime for the purposes of *Alleyne* and *Apprendi*, nothing in the reasoning of *Alleyne* requires rewriting section 664(a) to change the definitions of the elements.

19

Further, defendant has failed to demonstrate that due process requires personal premeditation and deliberation or reasonably foreseeable premeditation and deliberation by the perpetrator. Her analysis apparently begins with the premise that because premeditation and deliberation are elements of the crime defined in section 664(a), and because every crime must ordinarily include a mens rea element (other than certain regulatory offenses), guilt may not be based upon strict liability. (See *Staples v. United States* (1994) 511 U.S. 600, 605-606; *People v. Salas* (2006) 37 Cal.4th 967, 975-976, 978-980.) Defendant then cites language in *People v. Castenada* (2000) 23 Cal.4th 743, 749-750, to the effect that the due process requires a mental state of "guilty knowledge and intent" so that criminal liability will rest on "personal guilt," not simply on a defendant's conduct or association. She concludes that section 664(a) does not require a "mens rea, whether in the form of shared intent, knowledge, or even foreseeability." As we construe this conclusion in relation to defendant's other arguments, she is asserting instructional error in omitting the mens rea element of the crime of premeditated attempted murder.

As a finding of guilt of attempted murder is a prerequisite to a determination of premeditation and deliberation, section 664(a) necessarily and implicitly incorporates the elements of the crime of attempted murder, which include a mens rea element: the intent to kill. (See *Lee*, *supra*, 31 Cal.4th at pp. 624.) The trial court's instruction followed this reasoning. The court instructed the jury that to be guilty of attempted murder as an aider and abettor, it must find that defendant intended to kill the victim. The court further instructed that if the jury found defendant guilty of attempted murder under counts 1 and 2, it must then "decide whether the People have proved the *additional* allegation that the attempted murder was done willfully, and with premeditation or deliberation." (Italics added.)[5] The jury was thus instructed that intent to kill was an element of attempted

---

[5] The trial court instructed the jury with CALCRIM No. 601 in relevant part: "If you find the defendant guilty of attempted murder under counts 1 and 2, you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully, and with premeditation or deliberation. . . . The attempted

20

murder, and the allegation of premeditation and deliberation was *additional* to that adjudicated intent element. Assuming section 664(a) must now be deemed a new and separate crime, the mens rea element is not missing as defendant asserts, but incorporated into a statute containing the additional elements of premeditation and deliberation. As defendant was found guilty as a direct aider and abettor, the jury necessarily found that she harbored the necessary mental state of guilty knowledge and shared intent to kill. (See *People v. Smith*, *supra*, 37 Cal.4th at p. 741.)[6] Defendant's conviction of attempted murder as incorporated into section 664(a), thus rested on personal guilt, not strict liability, and the trial court's instructions did not omit the mens rea element of the crime.

Further, defendant has not demonstrated that the United States Supreme Court has prohibited states from enacting statutes which increase an aider and abettor's penalties based upon the mens rea of the perpetrator, or that it reached or discussed such an issue in *Alleyne*. We thus reject defendant's contention that the California Supreme Court's interpretations of section 664(a) in *Lee, supra*, 31 Cal.4th at pages 627-628, *Favor, supra*, 54 Cal.4th at page 877, and *Bright, supra*, 12 Cal.4th at pages 655-657 have been invalidated; and we remain bound by the court's interpretation in *Lee* as it applies to a direct aider and abettor such as defendant. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

---

murder was done willfully and with deliberation and premeditation if either the defendant or the shooter or both of them acted with that state of mind. . . . The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find the allegation has not been proved."

[6] Further, as the California Supreme Court observed in *Lee*, an attempted murderer convicted as a direct aider and abettor not only acts with intent to kill . . . , he or she also necessarily acts with a mental state at least approaching deliberation and premeditation -- concepts that entail "'"'careful thought and weighing of considerations'"'" and "'"'preexisting reflection'"'" [citation], as opposed to 'mere unconsidered or rash impulse hastily executed' [citation] -- because he or she necessarily acts with knowledge of the direct perpetrator's intent to kill and with a purpose of facilitating the direct perpetrator's accomplishment of the intended killing." (*Lee, supra*, 31 Cal.4th at p. 624.)

21

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ


We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST

22